# EXHIBIT "B"

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made and entered into this ___ day of July 2012, by and between David Seror, in his capacity as Chapter 7 Trustee of the Double S Development, LLP bankruptcy estate ("Trustee" or "Seller") and LCV Properties, LLC, a Texas Limited Liability Company ("Buyer").

## RECITALS

**A.** On February 25, 2009 Double S Development, LLP ("Double S" or "Debtor") filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Central District of California which was assigned Case No. 1:09-bk-12032 MT. The Trustee was thereafter appointed as the Trustee of the Double S bankruptcy estate (the "Estate");

**B.** Whereas on December 28, 2010, the Bankruptcy Court (as defined herein) entered an order on the Trustee's Motion to Approve Compromise Pursuant to Federal Rule of Bankruptcy Procedure 9019(a);

**C.** Whereas on August 4, 2011 the Bankruptcy Court entered an amended order on the Trustee's Motion to Approve Compromise Pursuant to Federal Rule of Bankruptcy Procedure 9019(a). The Amended Order provided that the Trustee is vested with absolute and unconditional title Residential Lots (as defined in the Amended Order) and, subject to further Bankruptcy Court Order, has the right to offer for sale and sell the Property;

**D.** Based upon the Trustee's investigations and information obtained from Republic Title Company, the Trustee believes that the Residential Lots consist of 497 residential lots in which the Estate claims an interest. The Estate's interests in the Residential Lots are the assets to be sold pursuant to this Asset Purchase Agreement and are defined herein as the "Assets".

**E.** Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller the Assets pursuant to, *inter alia*, section 363 of the Bankruptcy Code and the applicable Federal Rules of Bankruptcy Procedure;

**F.** The Trustee has determined that it is advisable and in the best interest of the Estate and the creditors of such estate to consummate the transactions contemplated by this Asset Purchase Agreement, upon the terms and conditions provided for herein; and

**G.** NOW THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt of which are hereby acknowledged, and subject to the terms and conditions hereof, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1    <u>Definitions</u>. In addition to any other terms defined elsewhere in this Agreement, the terms defined below shall have the meanings set forth herein.

BN 11974299v1

1

1.1.1 "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

1.1.2 "Alternative Transaction" means any transaction occurring after the Bidding Procedures Order is entered involving the consummation of the sale of all or any portion of the Property by Seller to a purchaser other than Purchaser and/or one or more of its Affiliates at any time during the pendency of the Bankruptcy Case

1.1.3 "Aqua Utilities Litigation" shall mean the action captioned as Aqua Utilities, Inc. v. DROY Properties, LLC Cause No. 07-09-09668-CV, pending in the District Court of Montgomery County, Texas, 359th Judicial District.

1.1.4 "Assets" shall mean the real property identified in the legal description attached hereto as **Exhibit "1."**

1.1.5 "Bankruptcy Code" shall mean the United States Bankruptcy Code.

1.1.6 "Bankruptcy Court" shall mean the United States Bankruptcy Court – Central District of California, San Fernando Division.

1.1.7 "Bidding Procedures" shall have the meaning set forth in section 7.1.2.

1.1.8 "Bidding Procedures Order" shall have the meaning set forth in section 7.1.2.

1.1.9 "Business Day" means any day of the year on which national banking institutions in Los Angeles, California are open to the public for conducting business and are not required or authorized to close.

1.1.10 "Claims" means any and all claims as defined in section 101(5) of the Bankruptcy Code.

1.1.11 "Closing" and "Close of Escrow" shall mean the close of escrow in connection with the sale contemplated by the Agreement.

1.1.12 "Closing Date" shall mean the tenth (10) business day following the Bankruptcy Court's entry of the Sale Order.

1.1.13 "Cure Date" shall have the meaning set forth in Section 13.2.

1.1.14 "Deed of Trust" shall mean the Deed of Trust which shall secure Buyer's obligations under the Promissory Note.

1.1.15 "Deposit" shall mean the sum of $500.00.

BN 11974299v1

EXHIBIT B PAGE 000042

1.1.16  "Excluded Assets" shall have the meaning set forth in section 2.2 herein.

1.1.17  "Escrow Agent" shall mean an escrow agent of Seller's choosing.

1.1.18  "Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

1.1.19  "Hazardous Substances" means any wastes, substances, products, pollutants or materials, whether solid, liquid or gaseous, that (i) is or contains asbestos, polychlorinated biphenyls, radioactive materials, oil, petroleum or any fraction thereof, (ii) requires removal, remediation or reporting under any Environmental Law, or is defined, listed or identified as a "contaminant", "pollutant", "toxic substance", "toxic material", "hazardous waste" or "hazardous substance" or words of similar meaning and regulatory effect thereunder or (iii) is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous or (iv) is otherwise regulated by any Governmental Body under any Environmental Law.

1.1.20  "Law" means any federal, state or local law, common law, statute, code, ordinance, rule, regulation or Order.

1.1.21  "Lis Pendens shall mean the Lis Pendens recorded by the Trustee on August 31, 2009 in County Clerk's File No. 2009-079626, of the Official Public Records of Montgomery County, Texas

1.1.22  "Members" shall mean the members of the Buyer, identified as: Josh Rothstein (30% interest in Buyer); Ron Regwan (30% interest in Buyer); Stefan Pardoe (30% interest in Buyer) and Pat Cain (10% interest in Buyer).

1.1.23  "Overbid Agreement" shall have the meaning set forth in section 7.1.1.

1.1.24  "Overbid Buyer" shall have the meaning set forth in section 7.1.1.

1.1.25  "Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

1.1.26  "Promissory Note" shall mean the Promissory Note executed by the Buyer pursuant to Section 3.1.3 herein.

1.1.27  "Purchase Price" shall mean the sum of $1,500 for each lot included within the definition of Assets;

1.1.28  "Permitted Assignee" shall mean a (a) limited liability company whose managing member is Buyer, or (b) limited partnership whose general partner is Buyer, or (c) a corporation whose majority shareholder is Buyer.

1.1.29  "Sale Approval Date" shall have the meaning set forth in 7.1.1.

3

1.1.30 "Sale Hearing" shall have the meaning set forth in section 7.1.1.

1.1.31 "Sale Motion" shall have the meaning set forth in section 7.1.1.

1.1.32 "Sale Order" shall have the meaning set forth in section 7.1.1.

1.1.33 "Title Company" shall mean Stewart Title, or such other title company of the Seller's choosing.

1.2     Other Definitional and Interpretive Matters.

1.2.1   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(a)     Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(b)     Dollars.  Any reference in this Agreement to "$" shall mean U.S. dollars.

(c)     Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one schedule shall be deemed to have been disclosed on each other schedule where such matter or item's relevance is readily apparent on the face of such item.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(d)     Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(e)     Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(f)     Herein.  The words such as "herein," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(g)     Including.  The words such as "includes" and "including" shall mean "including without limitation."

4

1.2.2   The parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. This Agreement and the rights and obligations of the parties hereunder shall be construed, interpreted and enforced in accordance with the laws of the State of California. The parties agree that any action brought to enforce or otherwise interpret this Agreement or the Sale Order shall be brought before the Bankruptcy Court and each party consents to its continuing and further jurisdiction to hear any such matters.

## ARTICLE 2
## PURCHASE AND SALE

2.1   Purchase and Sale of Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, pursuant to section 363 of the Bankruptcy Code, all of Seller's right, title and interests in the Assets free and clear of those liens, interests and encumbrances identified below:

2.1.1   Deed of Trust issued in favor of International Bank of Commerce in the amount of $2,500,000 dated January 19, 1999 and recorded January 29, 1999 in County Clerk's File No. 99006821, of the Official Public Records of Montgomery County, Texas;

2.1.2   Financing Statement issued in favor of International Bank of Commerce recorded January 29, 1999 in County Clerk's File No. 99006822, of the Official Public Records of Montgomery County, Texas and as assigned to Calson, LLC by Instrument recorded April 16, 2002 in County Clerk's File No. 2002-037431, of the Official Public Records, of Montgomery County, Texas;

2.1.3   The modification of the aforementioned Deed of Trust dated September 5, 2002 and recorded September 23, 2002 in County Clerk's File No. 2002-098995, of the Official Public Records, of Montgomery County, Texas

2.1.4   Deed of Trust issued in favor of Stephen S. Faden in the amount of $810,000 dated November 5, 2008 and recorded November 12, 2008 in County Clerk's File No. 2008-108983, of the Official Public Records of Montgomery County, Texas

2.1.5   Deed of Trust issued in favor of Stephen S. Faden in the amount of $810,000 dated November 5, 2008 and recorded November 24, 2008 in County Clerk's File No. 2008-111873, of the Official Public Records of Montgomery County, Texas

2.1.6   The earnest money contract by and between Dreamscape Land Development, Inc. and David Silberstein as shown in County Clerk's File No. 2008-111873, of the Official Public Records of Montgomery County, Texas

BN 11974299v1

## ARTICLE 3
## CONSIDERATION

3.1   <u>Consideration</u>. The price and consideration to be paid by the Buyer to the Seller for the Property shall be the Purchase Price. Buyer shall pay the Purchase Price to Seller as follows:

3.1.1   Buyer shall deliver to Escrow Agent the Deposit in Cash made payable to Escrow Agent within two (2) Business Days after Seller notifies Buyer that he has signed this Agreement. Escrow Agent shall place the Deposit in an interest-bearing account with a federally insured bank or savings and loan association with interest thereon to accrue to Buyer's benefit. The Deposit shall be applied as follows:

(i)   If the Closing shall occur, the Deposit, together with the interest accrued thereon, shall be applied to and credited towards the Purchase Price;

(ii)   If this Agreement is terminated by Seller due to breach by Purchaser, the Deposit shall be released to Seller as Seller's sole and exclusive remedy for such breach and termination;

(iii)   If this Agreement is terminated for any reason other than a breach by Purchaser, the Deposit shall be returned to the Purchaser.

(b)   <u>Balance of Purchase Price</u>. By no later than 5:00 p.m., Pacific Time, one (1) Business Day prior to the Closing Date, Buyer shall deliver to Escrow Agent the following:

(i)   $150.00 per lot to be sold pursuant to this Agreement, in immediately available, plus Buyer's share of costs, expenses, fees, charges, prorations and other amounts required to be paid by Buyer hereunder, less any credits due to Buyer hereunder.

(ii)   A Promissory Note in the amount of $1,350.00 per lot to be sold pursuant to this Agreement. The Promissory Note shall be in a form substantially similar to that which is attached hereto as **Exhibit "2,"** which is hereby approved by the Parties, and contain the following material terms:

(1)   The Promissory Note shall mature thirty (30) months from its date. All principal and unpaid interest shall become due and payable on the maturity date;

(2)   The Promissory Note shall accrue interest at a rate of six percent (6%) per annum for the entire term of the Promissory Note;

(3)   Said accrued interest shall be payable monthly to the Trustee, with all payments due on the first (1st) of every month;

BN 11974299v1

(4)    At the maturity date, all accrued but unpaid interest shall be added to the principal balance as of the maturity date, all of which shall be then due and owing;

(5)    The obligations set forth in the Promissory Note shall be secured by a first position Deed of Trust as set forth in Paragraph 3.1.1(b)(iii) herein; and

(6)    All obligations set forth in the Promissory Note and Deed of Trust (as herein defined) shall be guaranteed by the Members. Each member's guaranty shall be in an amount equal to that portion of the outstanding debt due under the Note and Deed of Trust equal to each Member's interest in the Buyer. The aforementioned Guaranty's of the Members shall be in a form substantially similar to that which is attached hereto as **Exhibit "3,"** which is hereby approved by the Parties;

(iii)    A deed of trust as security for the Promissory Note which shall be recorded against the Assets ("Deed of Trust"). The Deed of Trust shall be in a form substantially similar to that which is attached hereto as **Exhibit "4,"** which is hereby approved by the Parties, shall be in recordable form, and contain the following material terms:

(1)    Subject to (2) below, a due on sale clause which calls for the entire amount then due and owing to be paid in consideration for any release of the Deed of Trust;

(2)    A $2,000 per lot release price (to be applied to outstanding balance then due and owning).

## ARTICLE 4
## BUYER'S REPRESENTATIONS AND WARRANTIES

4.1    <u>Agreement Legally Binding</u>. This Agreement and all documents required hereby to be executed by Buyer are, and shall be, valid, legally binding obligations of, and enforceable against, Buyer in accordance with their terms.

4.2    <u>Representations Valid</u>. To Buyer's actual knowledge, no representation, warranty or statement of Buyer in this Agreement or in any document, certificate or schedule prepared by Buyer and furnished or to be furnished to Seller pursuant hereto contains or will contain any untrue statement or a material fact, omit or will omit to state a material fact necessary to make the statements or facts contained therein not misleading.

4.3    <u>Adequate Financial Resources</u>. Buyer has adequate financial resources to make timely payment of all sums due from Buyer hereunder and to perform all of its obligations hereunder.

4.4    <u>Litigation</u>. There are no legal proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, which, if adversely determined, would reasonably be expected to have a

7

BN 11974299v1

Purchaser Material Adverse Effect.  For the purposes of this Agreement, "Purchaser Material Adverse Effect" means a material adverse effect on the ability of Purchaser to (i) consummate the transactions contemplated hereby or by the Purchaser Documents without any material delay or (ii) perform its obligations under this Agreement.  Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a Purchaser Material Adverse Effect.

4.5    Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Seller in respect thereof.

4.6    Financial Capability.  To Purchaser's knowledge, Purchaser (i) has, based on existing commitments, sufficient funds available to pay the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) has, based on existing commitments, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (iii) has not incurred any obligation, commitment, restriction or liability of any kind, that would impair or adversely affect such resources and capabilities or could reasonably be expected to have a Purchaser Material Adverse Effect.  As of and subject to the Closing, Purchaser is not insolvent, does not have unreasonably small capital with which to operate the Business, and has not incurred or committed to incur debts beyond its ability to repay such debts.

4.7    Purchaser's Investigation.  Purchaser represents that it is a sophisticated buyer that was advised by knowledgeable counsel and financial and other advisors and hereby acknowledges that he has conducted to its satisfaction, its own independent investigation and analysis of the Property and, in making the determination to proceed with the transactions contemplated by this Agreement, Purchaser has relied solely on the results of its own independent investigation and the express representations set forth in this Agreement.

4.8    Survival of Buyer's Representations and Warranties.  Buyer's representations and warranties shall survive the Close of Escrow for the period of the term of the Promissory Note.

**ARTICLE 5**
**ACKNOWLEDGMENTS BY BUYER**

5.1    Buyer hereby expressly acknowledges, agrees, represents and warrants to Seller as follows:

5.1.1    Buyer is a sophisticated, experienced purchaser of residential property such as the Property, and has the full expertise to evaluate, inspect and perform all obligations under this Agreement.

5.1.2    "AS-IS, WHERE-IS" PURCHASE

**BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE AND HEREBY SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY, OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS**

8

TO, OR CONCERNING (i) THE NATURE, SQUARE FOOTAGE, CONDITION, VALUE, OR QUALITY OF THE PROPERTY, INCLUDING BUT NOT BY WAY OF LIMITATION, THE WATER, THE SOIL, AND GEOLOGY, AND THE SUITABILITY THEREOF AND OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY ELECT TO CONDUCT THEREON; (ii) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, CONDITION, QUALITY, THE STATE OF REPAIR OR LACK OF REPAIR OF ANY OF THE PROPERTY; (iii) THE NATURE AND EXTENT OF ANY RIGHT-OF-WAY, LEASE, POSSESSION, LIEN, ENCUMBRANCE, LICENSE, RESERVATION, CONDITION, OR ANY OTHER ASPECT OF TITLE TO THE PROPERTY; (iv) THE COMPLIANCE OF THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES, OR REGULATIONS OF ANY GOVERNMENT OR OTHER BODY; (v) THE INCOME TO BE DERIVED FROM THE PROPERTY; (vi) THE EXISTENCE OF ANY VIEW FROM THE PROPERTY OR THAT ANY EXISTING VIEW WILL NOT BE OBSTRUCTED IN THE FUTURE; (vii) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; (viii) THE STRUCTURAL INTEGRITY OF ANY IMPROVEMENTS ON THE PROPERTY; (ix) THE CONFORMITY OF THE IMPROVEMENTS TO ANY PLANS OR SPECIFICATIONS FOR THE PROPERTY THAT MAY BE PROVIDED TO BUYER; (x) THE CONFORMITY OF THE PROPERTY TO APPLICABLE ZONING OR BUILDING CODE REQUIREMENTS; (xi) THE EXISTENCE OF SOIL INSTABILITY, PAST SOIL REPAIRS, SUSCEPTIBILITY TO LANDSLIDES, SUFFICIENCY OF UNDER-SHORING, SUFFICIENCY OF DRAINAGE, OR ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE LAND OR ANY BUILDINGS OR IMPROVEMENTS SITUATED THEREON; (xii) WHETHER THE PROPERTY IS LOCATED IN A SPECIAL STUDIES ZONE UNDER THE PUBLIC RESOURCES CODE OR A SEISMIC HAZARDS ZONE OR A STATE FIRE RESPONSIBILITY AREA, OR A SPECIAL FLOOD HAZARD ZONE; OR (xiii) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY. BUYER ACKNOWLEDGES THAT THE PROPERTY MAY NOT BE IN COMPLIANCE WITH APPLICABLE ZONING, BUILDING, HEALTH OR OTHER LAW OR CODES, AND NEITHER SELLER NOR ANY PERSON ACTING AS SELLER'S REPRESENTATIVE OR AGENT HAS OCCUPIED THE PROPERTY AND THAT THE PROPERTY MAY NOT BE IN HABITABLE CONDITION. BUYER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT BUYER HAS THOROUGHLY INSPECTED AND EXAMINED THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY BUYER IN ORDER TO ENABLE BUYER TO EVALUATE THE PURCHASE OF THE PROPERTY. BUYER HEREBY FURTHER ACKNOWLEDGES AND AGREES THAT BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION, AND EVALUATION OF THE PROPERTY BY BUYER AND THAT AS A MATERIAL INDUCEMENT TO SELLER TO EXECUTE AND ACCEPT THIS AGREEMENT, AND IN CONSIDERATION OF THE PERFORMANCE BY SELLER OF ITS DUTIES AND OBLIGATIONS UNDER THIS AGREEMENT, BUYER IS PURCHASING THE PROPERTY ON AN "AS IS, WHERE IS" AND "WITH ALL FAULTS" BASIS AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER. AND

BN 11974299v1

BUYER EXPRESSLY ACKNOWLEDGES THAT, IN CONSIDERATION OF THE AGREEMENTS OF SELLER HEREIN, SELLER MAKES NO WARRANTY OR REPRESENTATION EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO ANY WARRANTY OR CONDITION, HABITABILITY, MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.  IT IS FURTHER AGREED THAT SELLER HAS NOT WARRANTED, AND DOES NOT HEREBY WARRANT THAT THE PROPERTY OR ANY IMPROVEMENTS LOCATED THEREON NOW OR IN THE FUTURE WILL MEET OR COMPLY WITH THE REQUIREMENTS OF ANY SAFETY CODE OR REGULATION OF THE STATE, COUNTY, OR CITY WHERE THE PROPERTY IS LOCATED, OR ANY OTHER AUTHORITY OR JURISDICTION.  BUYER FURTHER ACKNOWLEDGES AND AGREES THAT WITHOUT LIMITATION, SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT OR WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, AS DEFINED BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS OR THE DISPOSAL OR EXISTENCE, IN OR ON THE PROPERTIES, OF ANY HAZARDOUS SUBSTANCE, AS DEFINED BY THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, AND REGULATIONS PROMULGATED THEREUNDER.  BUYER FURTHER ACKNOWLEDGES THAT THE AS-IS NATURE OF THE TRANSACTION AND THE OTHER TERMS AND CONDITIONS DESCRIBED IN THIS SECTION HAVE BEEN TAKEN INTO ACCOUNT IN THE ESTABLISHMENT OF THE PURCHASE PRICE.  BUYER HEREBY WAIVES ALL RIGHTS OF RECOVERY, LOSSES, DAMAGES, CLAIMS, ACTIONS OR CAUSES OF ACTION IT MAY HAVE AGAINST SELLER WITH RESPECT TO OR ON ACCOUNT OF THE CONDITION OF, AND ANY MATTER RELATING TO OR AFFECTING, TITLE TO THE PROPERTY AND AGREES THAT IT WILL LOOK SOLELY TO THE TITLE POLICY WITH RESPECT TO ANY AND ALL SUCH RIGHTS, LOSSES, DAMAGES, CLAIMS, ACTIONS AND/OR CAUSE OF ACTION.

5.1.3   Neither Seller nor any Seller Parties have made any representations or warranties of any kind, nature or description, direct or implied, verbal or written, with respect to the Property.

5.1.4   Seller is acting solely in his capacity as Trustee for the Estate.  Any actions taken or documents executed by the Seller shall only be in his capacity as Trustee.

## ARTICLE 6
## BUYER'S DUE DILIGENCE

6.1   <u>Buyer's Investigations</u>. Buyer is relying upon Buyer's own independent investigation of the Property in entering into this Agreement and purchasing the Property.  Any investigations or due diligence by the Buyer must be completed by 5:00 p.m. 10 days after the mutual execution of this Asset Purchase Agreement.

10

BN 11974299v1

    6.2    <u>Physical Inspections.</u>  Buyer shall investigate and inspect the Property to the extent Buyer deems necessary in Buyer's sole discretion, including, but not limited to, the following: Physical condition of the Property; the composition, condition, stability, compaction and buildability of the Property's soil and geology; size and dimensions of the Property; income and expenses of the Property; rights and obligations of any tenants or other occupants of the Property; accuracy, completeness or adequacy of the legal description of the Property; all documents, encumbrances, exceptions and other matters affecting title of the Property; all federal, state, county, municipal and local laws, rules and regulations affecting the Property, including, but not limited to, environmental and other laws dealing with Hazardous Substances; the Americans with Disabilities Act; zoning, land and other use restrictions, conditional use permits, development agreements, permits, permit restrictions, redevelopment plans, building codes, taxes, bonds, assessments; the Property's fitness or suitability for any particular purpose, use or enjoyment (including, without limitation, those intended or desired by Buyer); the feasibility of development of the Property; and present or future availability and adequacy of services and utilities, including, but not limited to, water, electricity, gas, telephone, heating, ventilation, air conditioning, sprinklers, sewers, plumbing, storm drain, drainage, elevators, escalators, landscaping, janitorial, window washing, security, patrol, guards, parking attendants and valets.

    6.3    <u>Risks of No Investigations.</u>  If Buyer fails, decides or elects not to perform any investigation, inspection or review of the Property, Buyer is doing so at Buyer's own risk, and Buyer is accepting and assuming all risks and Claims associated therewith.

    6.4    <u>Inspection and Buyer's Entry to Property.</u>  Provided that Buyer is not and has not been in breach or default hereunder Buyer and/or Buyer's agents may enter the Property to perform tests or inspections upon the following terms and conditions:

        6.4.1    Any tests or inspections which are invasive shall have been approved by Seller in its sole and absolute discretion.

        6.4.2    Buyer shall provide Seller at least two (2) Business Days prior written notice before entering the Property to perform any tests or inspections.

        6.4.3    Buyer's tests or inspections shall be performed only by Persons that are duly qualified, experienced, registered, insured and licensed in the State of Texas.

        6.4.4    Buyer shall timely and fully pay for, and shall indemnify and hold the estate harmless from and all costs and expenses relating to the costs and expense of any and all tests or inspections and any other work conducted or materials furnished with respect to the Property by or for Buyer or Buyer's agents.

        6.4.5    Buyer shall repair or restore any and all damage or injury to the Property resulting from any invasive tests or inspections.

11

6.5    Buyer's Insurance Obligations.  Buyer and Buyer's agents shall, prior to commencing any tests or inspections at the Property, and at all times thereafter while performing any tests or inspections at the Property, maintain the following insurance policies:

6.5.1    Worker's compensation insurance as required by all applicable Laws;

6.5.2    Commercial general liability insurance in an amount of not less than $2,000,000 per occurrence, using the Insurance Service Office with Broad Form General Liability Endorsement (GLO404) or equivalent, and products and completed operations endorsements;

6.5.3    Automobile liability insurance in an amount of not less than $1,000,000 per occurrence;

6.5.4    Employer's liability coverage in an amount of not less than $1,000,000 per occurrence; and

6.6    Survival. Buyer's obligations under this Section shall survive the termination of this Agreement or the Close of Escrow.

6.7    Time is of the Essence.  Time is of the essence of Buyer's obligations under this Agreement, including, but not limited to, with respect to the Close of Escrow on or before the Closing Date. Except in connection with any cure period provided herein, the Closing Date is not subject to extension or delay for any reason whatsoever by or for Buyer.

## ARTICLE 7
## COURT APPROVAL

7.1    Court Approval of Sale. Buyer hereby acknowledges and agrees as set forth below:

7.1.1    As soon as reasonably possible following the full execution of this Agreement, Seller will file a motion with the Bankruptcy Court (the "Sale Motion") for an order (the "Sale Order") from the Bankruptcy Court which (i) approves the sale of the Property to Purchaser on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with this transaction, (ii) includes a specific finding that Purchaser is a good faith Purchaser of the Property pursuant to Bankruptcy Code §363(m), (iii) provides for a waiver of the stays contemplated by Bankruptcy Rules 6004(h) and 6006(d); (iv) states that the sale of the Property to Purchaser shall be free and clear of all liens, claims, interests and encumbrances whatsoever (other than the lien of current taxes not yet payable with respect to any Property). Following the filing of the Sale Motion, Seller shall use commercially reasonable efforts to obtain prompt entry of the Sale Order.  Both Purchaser's and Seller's obligations to consummate the transactions contemplated in this Agreement shall be conditioned upon the Bankruptcy Court's entry of the Sale Order.  Seller makes no representations or warranties that no objections will be made to the Bankruptcy Court.  In particular, Buyer acknowledges and agrees that various parties may object to the Sale Motion, Sale Order, or the sale as contemplated by this Agreement, and there is no guaranty that the Bankruptcy Court will overrule these objections and approve the terms of this Agreement.  If the Bankruptcy Court refuses to issue the Sale Order or

12

to approve any third party buyer at the hearing on the Sale Motion (the "Sale Hearing"), then this Agreement shall automatically terminate, and Seller and Purchaser shall be relieved of any further liability or obligation hereunder. In the event that a third party (an "Overbid Buyer" and the underlying agreement between the Overbid Buyer and Seller, the "Overbid Agreement") is approved by the Bankruptcy Court as the buyer of the Property at the Sale Hearing, then, notwithstanding anything to the contrary in this Agreement, this Agreement shall not terminate, but rather shall become a "back-up bid" which shall remain open for acceptance by Seller following entry by the Bankruptcy Court of the Sale Order, but subject and subordinate in all respects to the rights of the Overbid Buyer under the Overbid Agreement.  Upon entry of the Sale Order in accordance with the provisions of this Section 7.1 (such entry date being referred to herein as the "Sale Approval Date"), the condition set forth in this Section 7.1 shall conclusively be deemed satisfied.

      7.1.2    As part of the Sale Motion (or pursuant to a separate motion in Seller's discretion), Seller shall also request and use reasonable good faith best efforts to obtain from the Bankruptcy Court an order (the "Bidding Procedures Order") which approves the following bidding procedures (the "Bidding Procedures"):  (i)  no prospective Overbid Buyer will be permitted to bid unless such party has been deemed "financially qualified" by Seller; (ii) no prospective Overbid Buyer will be permitted to bid unless such prospective Overbid Buyer deposits with the Escrow Agent an amount in cash equal to the Deposit; (iii) no prospective Overbid Buyer who bids for the  Assets shall be entitled to purchase those lots unless such prospective Overbid Buyer offers to purchase those lots for consideration which is at least $50 per lot greater than the consideration set forth in this Agreement (including all cash, non-cash consideration and assumed liabilities) and otherwise on terms at least as favorable to Seller's estate as those set forth in this Agreement; and (iv) after any initial overbid, each successive overbid must be in increments of at least $50.00 per lot and Seller shall, in Seller's discretion, has determined that such overbids satisfy such bidding increment requirement.  Should overbidding take place, Purchaser shall have the right, but not the obligation, to participate in the overbidding and be approved as the successful Overbid Buyer.  The form of the Bidding Procedures Order has been approved by Seller and Purchaser and shall be submitted to the Court for approval.

      7.1.3    Purchaser agrees that it will promptly take such reasonable actions as are reasonably requested by Seller to assist in obtaining the Sale Order and the Bidding Procedures Order, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

## ARTICLE 8
## CONDITIONS TO CLOSING

      8.1    Conditions Precedent to Obligations of Purchaser.  The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to and contingent on the actual or deemed satisfaction or waiver of each of the conditions set forth in this Section 8.1 (collectively, "Buyer's Contingencies" and individually "Buyer's Contingency").  Buyer shall use Buyer's best efforts to satisfy all of Buyer's Contingencies to be satisfied by Buyer in the time

BN 11974299v1

and manner provided. the satisfaction, on or prior to the Sale Hearing Date, of each of the following conditions:

8.1.1  Seller shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date;

8.1.2  The Title Company shall issue the title policy to Buyer as of the Close of Escrow subject only to the permitted title exceptions. If the Title Company named herein fails or refuses to issue to Buyer the title policy, then Seller shall have the right to select another; and

8.1.3  Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 11.1.

8.1.4  Buyer's Contingencies are for the benefit of and may be waived by Buyer; provided however, that Buyer does not have the authority to waive Section 8.3. If any of Buyer's Contingencies are not satisfied, then Buyer shall have the right, in Buyer's sole and absolute discretion, to terminate this Agreement effective upon notice to Seller from Buyer.

8.2    Conditions Precedent to Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to and contingent on the actual or deemed satisfaction or waiver of each of the conditions set forth in this Section 8.2 (collectively, "Seller's Contingencies" and individually "Seller's Contingency"). Seller shall use Seller's best efforts to satisfy all of Seller's Contingencies to be satisfied by Seller in the time and manner provided. the satisfaction, on or prior to the Closing Date, of each of the following conditions:

8.2.1  Each of the representations and warranties of Purchaser set forth in Article IV shall be true and correct, in all material respects on and as of the date hereof and as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date) with the same force and effect as though made on and as of the Closing Date, except that those representations and warranties that are qualified by materiality, Material Adverse Effect or similar phrases shall be true and correct in accordance with their terms as of the date hereof and on and as of the Closing Date (or on the date when made in the case of any representation and warranty which specifically relates to an earlier date) with the same force and effect as though made on and as of the Closing Date;

8.2.2  Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date; and

8.2.3  Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 11.2.

8.2.4  Seller's Contingencies are for the benefit of and may be waived by Seller; provided however, that Seller does not have the authority to waive Section 8.3 without obtaining Court approval. If any of Seller's Contingencies are not satisfied, then Seller shall have the right,

14

EXHIBIT B PAGE 000054

in Seller's sole and absolute discretion, to terminate this Agreement effective upon notice to Buyer from Seller.

8.3     Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Purchaser and Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

8.3.1    There shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

8.3.2    The Bankruptcy Court shall have entered the Sale Order; and

8.3.3    The Bankruptcy Court shall have entered the Bidding Procedures Order if appropriate.

## ARTICLE 9
## TERMINATION

9.1     Termination of Agreement.  This Agreement may be terminated prior to the Close of Escrow as follows:

9.1.1    By Seller if, as a result of Purchaser's defaults, breaches or delays, the Close of Escrow shall not have occurred on or before the Closing Date.

9.1.2    By mutual written consent of Seller and Purchaser;

9.1.3    By Purchaser, if any of the conditions to the obligations of Purchaser set forth herein shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement of Purchaser contained in this Agreement, and such condition is not waived by Purchaser;

9.1.4    By Seller, if any condition to the obligations of Seller set forth herein shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement of Seller contained in this Agreement, and such condition is not waived by Seller;

9.1.5    By Seller or Purchaser if there shall be in effect an Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, or the Bankruptcy Court or another court of competent jurisdiction shall stay the Sale Order; or

9.1.6    By Purchaser or Seller, if the Bankruptcy Court shall enter an Order approving an Alternative Transaction.

BN 11974299v1

9.2    <u>Seller's Option to Extend</u>. In lieu of terminating the Agreement pursuant to section 9.1.1, Seller shall have the option, in his sole and absolute discretion, to extend the date for the Close of Escrow to a reasonable later date.

9.3    <u>Return of Deposit.</u> If this Agreement is terminated pursuant to sections 9.1.3; 9.1.4; 9.1.5; 9.1.6 or 9.1.7, Escrow Agent shall return to Buyer the Deposit, provided however if escrow fails to close due to Buyer's default, Seller shall retain the Deposit as liquidated damages pursuant to Article XVI below.

9.4    <u>Conditions to Refund of Deposit</u>.  Buyer shall, within five (5) days after such termination, and if Buyer is entitled to a refund of the Deposit then as a condition to the return of the Deposit to Buyer, at no charge to Seller, deliver to Seller the following (which obligation shall survive the termination of this Agreement):

9.4.1    Documents reasonably requested by Seller or Escrow Agent to confirm the termination of this Agreement and the Escrow established hereunder;

9.4.2    Unconditional final lien releases from all of Buyer's agents or any others, if any, who performed any tests, inspections or work on the Property for or on behalf of Buyer, showing payment in full of their claims, if any; and

9.4.3    All maps, environmental reports, civil and soil engineering reports relating to the Property which have been prepared by or for Buyer shall thereupon be delivered by Buyer to Seller, and, to the extent legally assignable by Buyer, be deemed assigned to, and the property of, Seller without further act or consideration by Seller or any representation or warranty by Buyer.

9.5    <u>Cancellation Fees.</u> Buyer shall be responsible for payment of the cancellation fees and expenses of the Escrow Agent and the Title Company.

9.6    <u>No Further Liability</u>.  Neither Party thereafter shall have any liability to the other Party under this Agreement, except (i) to the extent that Buyer may have breached this Agreement (in which case Seller shall have the right to pursue all of Seller's rights and remedies against Buyer as provided herein), and (ii) the obligations of the Parties hereunder which by the express provisions of this Agreement survive termination.

## ARTICLE 10
## INDEMNITY BY BUYER

10.1    <u>Scope of Indemnity.</u>  Buyer hereby expressly and unconditionally agrees to protect, indemnify, defend (with counsel reasonably satisfactory to Seller) and hold harmless Seller and his agents from and against any and all Claims directly or indirectly arising from, in connection with, caused by, or related to, any of the following:

10.1.1  Entry onto, use or occupancy of the Property by Buyer or Buyer's agents prior to the Close of Escrow, including, but not limited to, performance of any tests or inspections; provided, however, that Buyer's obligation hereunder shall not extend to any

diminution in the value of the Property caused by the discovery of any environmental or other conditions on or with respect to the Property not caused by Buyer or Buyer's agents;

10.1.2  Any acts, omissions or negligence of Buyer or Buyer's agents between the Effective Date and the Close of Escrow;

10.1.3  Present or future condition of the Property, including, but not limited to, any environmental damages, the violation of any environmental requirements or the presence of any Hazardous Substances;

10.1.4  The claim for a fee or commission by any broker or finder claiming through Buyer, including without limitation any broker; and

10.1.5  Buyer's breach of or default under this Agreement.

10.2    Obligation to Pay Expenses and Claims. The obligation of Buyer under this Section shall include, but not be limited to, the burden and expense of defending all Claims, suits and administrative proceedings (with counsel reasonably approved by Seller), even if such Claims, suits or proceedings are groundless, false or fraudulent, and conducting all negotiations of any description, and paying and discharging, when and as the same become due, any and all Claims, judgments, penalties or other sums due against Seller.

10.3    Buyer's Counsel. Buyer may, at Buyer's expense, employ additional counsel of Buyer's choice to associate with counsel representing Seller. Buyer shall, in connection with any Claim for which Seller has requested indemnification under this Agreement, be entitled to assume the defense of any related litigation, arbitration or other proceeding, provided that Seller may, at Seller's election and expense, participate in such defense, and provided further that in the event of any difference of opinion or strategy with respect to the defense of such action or the assertion of counterclaims to be brought with respect thereto, Buyer's counsel shall, after consultation with Seller's counsel, determine the actual strategy, defense and counterclaim to be employed. At Buyer's reasonable request, Seller shall cooperate with Buyer in the preparation of any defense to any such Claim, and Buyer will reimburse Seller for any reasonable expenses incurred in connection with such request. If Buyer does not elect to assume the defense of any such matter, Buyer shall have the right, at Buyer's sole cost and expense, to employ separate counsel acceptable to Seller and participate in such defense, provided that in the event of any difference of opinion or strategy with respect to the defense of such action or the assertion of counterclaims to be brought with respect thereto, Seller's counsel shall, after consultation with Buyer's counsel, determine the actual strategy, defense and/or counterclaim to be employed.

10.4    Survival. The obligations of Buyer under this Section shall survive the Close of Escrow or earlier termination of this Agreement.

BN 11974299v1

17

## ARTICLE 11
## DELIVERIES

11.1    <u>Deliveries by Seller.</u>  At Closing, Seller shall deliver to Escrow Agent:

11.1.1  The Trustee's Deed Without Warranty conveying the Property to Buyer in the form attached hereto as **Exhibit "5"** ("Deed"), duly executed and acknowledged by Seller; and

11.1.2  A copy of the Sale Order approving the sale pursuant to Section 7.1.1;

11.1.3  Such other instruments or instructions as Escrow Agent or Buyer may reasonably request in order to consummate this transaction and such other documents required of Seller under the terms of this Agreement;

11.2    <u>Deliveries by Purchaser</u>.  At Closing, Purchaser shall deliver to Escrow Agent:

11.2.1  Any such documents, instruments or instructions as Escrow Agent or Buyer may reasonably request in order to consummate this transaction and such other documents required of Seller under the terms of this Agreement.

11.3    <u>Delivery of Agreement by Seller and Buyer; Supplemental Escrow Instructions.</u>  Seller and Buyer agree to deposit an executed original or originally executed counterparts of this Agreement with Escrow Agent within two (2) Business Days following the execution of this Agreement by Buyer and Seller.  Escrow Agent is hereby directed by the Parties to take all actions, recordings and disbursements reasonably necessary in order to follow the instructions of the Parties hereto contained in this Agreement and all amendments.  In addition, Buyer and Seller agree to execute, deliver and be bound by any reasonable and customary supplemental escrow instructions of Escrow Agent or other instruments as may reasonably be required by Escrow Agent in order to consummate the transaction contemplated by this Agreement.  Any such supplemental instructions shall not conflict with, amend or supersede any portions of this Agreement.  If there is any inconsistency between such supplemental instructions and this Agreement, this Agreement shall govern and control in all respects.

## ARTICLE 12
## CHARGES AND PRORATIONS

12.1    <u>Payments by Buyer and Seller</u>.  Buyer shall be responsible for the costs of recording the Deed, one-half of Escrow Agent's fees, and any other customary closing costs typically paid by purchasers of real property in the city where the Property is located.  Seller shall be responsible for one-half of Escrow Agent's fees, any documentary transfer taxes, the and any other customary closing costs typically paid by sellers of real property in the city where the Property is located.  Buyer shall be entitled to a one-time credit of $250.00 (in the aggregate not per lot) representing the transfer fees to be charged by the Homeowners Association in place for the Property.

12.2    <u>Title Policy Premium</u>.  Seller shall pay the Title Company's normal and customary premium for a standard title policy.  Buyer shall pay the additional cost for an

18

extended title policy and any endorsements to the title policy.  Buyer shall pay costs of Lenders Policy on Deed of Trust.

12.3   <u>Legal Fees and Expenses</u>.  Buyer and Seller shall each pay their own legal fees and incidental costs and expenses incurred in connection with this Agreement.

12.4   <u>Prorations</u>.  The following shall be prorated between Seller and Buyer as of 12:01 a.m. on the date of the Close of Escrow, based upon the actual number of days in a year or a month, as follows:

12.4.1  All non-delinquent real estate taxes, bonds and assessments on the Property for the current fiscal year.  In no event shall Seller be charged with or be responsible for any increase in the real estate taxes on the Property resulting from the sale of the Property pursuant to this Agreement or from any improvements made or leases entered into on or after the Close of Escrow.  If any bond or assessment on the Property is payable in installments, then the installment for the current period shall be prorated (with Buyer assuming the obligation to pay any installment due after the Close of Escrow).  All real estate tax refunds, rebates or reductions for the period prior to the Close of Escrow and which are received or payable after the Close of Escrow shall belong to and be paid to Seller for the benefit of the Estate; and

12.4.2  In the event that there are any unknown amounts to be prorated as of the Close of Escrow, then Seller and Buyer will prorate the same promptly after the Close of Escrow and outside the Escrow.

## ARTICLE 13
## INCURABLE EVENTS; SELLER'S DEFAULT

13.1   <u>Inability to Deliver Title, Title Policy or Other Incurable Events</u>.  Buyer acknowledges and agrees that if this sale and purchase shall not be successfully consummated as a result of Seller's inability to deliver title of the Property to Buyer, or the refusal of the Title Company or another title insurer to deliver to Buyer the Title Policy as provided under this Agreement, or due to any other incurable event outside of Seller's control, then Seller shall not be considered in default hereunder and shall have no liability to Buyer of any kind or nature and this Agreement shall be terminated.  In such event, Buyer shall be entitled to the return of the Deposit and any other funds paid to Escrow Agent, together with interest accrued thereon.

13.2   <u>Defaults by Seller</u>.  If Seller fails to perform any of Seller's obligations under this Agreement that are curable by Seller, then Buyer shall immediately give written notice thereof to Seller and the Bankruptcy Court, which notice shall specify in reasonable detail the manner and reasons for Seller's alleged default, and such notice shall be accompanied by documents, information and matters reasonably necessary to substantiate Buyer's claims of Seller's default. Seller shall not be deemed or construed to be in default of Seller's obligations under this Agreement unless Seller fails to cure such default within ten (10) Business Days after Seller's receipt of such written notice from Buyer or if Bankruptcy Court approval is required ten (10) Business Days after Seller obtains approval of the Court to complete such cure ("**Cure Date**"); provided, however, if the nature of Seller's default is such that more than ten (10) Business Days are reasonably required for its cure, then Seller shall not be deemed to be in default of its

19

BN 11974299v1

obligations hereunder if Seller, within ten (10) Business Days after the Cure Date commences to take steps toward curing the alleged default and thereafter diligently prosecutes such cure to completion, provided such cure period shall in no event exceed thirty (30) days. Buyer acknowledges that (i) Seller may only proceed to cure Seller's alleged default after obtaining approval from the Bankruptcy Court, and (ii) the Bankruptcy Court shall determine the scope and timing of any such cure. The Closing Date shall, at Seller's sole option, be extended by the number of days that Seller requires to cure its default after receiving Buyer's default notice under this Section. Notwithstanding the foregoing, if such cure is not completed by Seller within such ten (10) Business Day or thirty (30) day periods, as applicable, or if Seller fails to obtain any required approval of the Bankruptcy Court to complete such cure within ten (10) Business Days after Seller's receipt of written notice from Buyer pursuant to the first sentence of this section, Buyer's only remedy shall be to terminate this Agreement and the Escrow and receive a refund of the Deposit and all other funds paid to Escrow Agent, together with interest accrued thereon.

13.3    Release. Notwithstanding anything to the contrary herein, as an express material consideration and condition for Seller to enter into this Agreement, Buyer hereby releases, acquits and discharges Seller and the Seller agents from and against any and all consequential, incidental, indirect, special, collateral, exemplary or punitive damages arising out of, in connection with or related to Seller's violation, breach or default of this Agreement including, but not limited to, any Claim for loss of profit, loss of opportunity, loss of production or loss of use, regardless of whether the damages sought are based on contract, tort, statute or otherwise, and irrespective of whether sole, concurrent or other negligence, whether active or passive, or strict liability is involved or is asserted.

Buyer's Initials: SP    .

## ARTICLE 14
## ASSIGNMENT

14.1    No Assignment. Except as otherwise provided below, the rights and obligations of Buyer under this Agreement may not be assigned by Buyer.

14.2    Permitted Assignees. Seller hereby consents to the assignment of Buyer's interest under this Agreement to a Permitted Assignee provided that all the following terms and conditions are satisfied:

14.2.1  Buyer is not in material breach of its duties or obligations under this Agreement;

14.2.2  Buyer provides to Seller and Escrow Agent at least ten (10) days advance written notice of such assignment;

14.2.3  At least five (5) business days prior to the Closing Date, Buyer shall provide to Seller and Escrow Agent a copy of the written assignment of this Agreement by Buyer to the Permitted Assignee, and assumption hereof by the Permitted Assignee, under which assumption such Permitted Assignee shall agree for the benefit of Seller and Escrow Agent (i) to perform by and to abide by all of the terms, covenants and conditions of this Agreement to be performed by Buyer, including, but not limited to, payment of the Purchase Price, (ii) reaffirm

EXHIBIT B PAGE 000060

Buyer's release and indemnity of Seller hereunder, (iii) reaffirm all of Buyer's representations and warranties hereunder, and (iv) ratify and reaffirm all actions taken by Buyer prior to such assignment as if such actions were taken by assignee.

14.3   Guaranty Unaffected By Assignment.  In the event that Buyer assigns its rights and obligations under this Agreement to a Permitted Assignee, Buyer shall remain liable for the obligations set forth in this Agreement, the Promissory Note and the Deed of Trust.

## ARTICLE 15
## MISCELLANEOUS

15.1   No Waiver.  The waiver by either Party of the performance of any covenant, condition or promise, shall not invalidate this Agreement, nor shall it be considered a waiver of any other covenant, condition or promise.  The waiver by either Party of the time for performing any act shall not constitute a waiver of time for performing any other act or any identical act required to be performed at a later time.

15.2   Amendments.  All amendments and supplements to this Agreement must be in writing and executed by each Party hereto.

15.3   Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in several counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  However, this Agreement shall not be binding on any Party until all Parties have executed this document, either all on one document or in counterparts. Facsimile or electronic transmissions of counterparts displaying facsimile or electronically reproduced copies of signatures shall be accepted and binding with the same force and effect as "wet signed" originals of the counterpart which have been personally delivered to the addressee of the facsimile or electronic transmission, provided that original counterparts are subsequently delivered to the receiving party.

15.4   Time of Essence.  Time is of the essence of this Agreement.

15.5   Condemnation.  Seller shall promptly notify Buyer if Seller, in his sole capacity as Trustee, actually receives notice that the Property is or shall be the subject of a condemnation proceeding before the Close of Escrow.  Buyer shall have the option by notice to Seller and Escrow Agent within ten (10) days after notice from Seller to (a) proceed with the Close of Escrow and deal with the condemning authority (in which event Seller shall assign to Buyer all of Seller's rights to the condemnation proceeds); or (b) provided Buyer is not in default, terminate this Agreement (in which event the Deposit shall be immediately returned to Buyer, and Escrow Agent shall immediately return all other documents, instruments and monies to the party that deposited same).

15.6   No Oral Agreements.  It is understood and acknowledged that there are no oral agreements between the Parties hereto affecting this Agreement and that this Agreement supersedes and cancels any and all previous negotiations, arrangements, brochures, advertisements, set-ups, agreements and understandings, if any, between the Parties hereto or displayed by Seller to Buyer with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Agreement.  This Agreement contains all of the terms,

21

EXHIBIT B PAGE 000061

covenants, conditions, warranties and agreements of the Parties relating in any manner to the sale of the Property and shall be considered to be the only such agreement between the Parties hereto and their representatives and agents. All negotiations and oral agreements acceptable to both Parties have been merged into and are included herein. There are no other representations or warranties between the Parties, and all reliance with respect to representations is based totally upon the representations and agreements contained in this Agreement, if any.

15.7    Captions.  The necessary grammatical changes required to make the provisions hereof apply either to corporations, limited liability companies, partnerships or individuals, men or women, as the case may require, shall in all cases be assumed as though in each case fully expressed. The captions herein are for convenience only and shall not be deemed to limit, construe, affect or alter the meaning hereof. If any term, provision or condition contained in this Agreement shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such term, provision or condition to persons or circumstances other than those with respect to which it is invalid or unenforceable, shall not be affected thereby, and each and every other term, provision and condition of this Agreement shall be valid and enforceable to the fullest extent possible permitted by law.

15.8    NO JURY TRIAL.  To the extent permitted by law, in the event of any dispute or controversy concerning this Agreement, the Court shall decide any such matter and all controversies and claims without a jury. BUYER AND SELLER ACKNOWLEDGE AND AGREE BY INITIALING BELOW THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES, AND THEREFORE, BUYER AND SELLER HEREBY AGREE IN ANY ACTION OR PROCEEDING (INCLUDING ACTIONS SOUNDING IN TORT) TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ARISING FROM THE TRANSACTION CONTEMPLATED HEREUNDER AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE RESOLVED AT THE DIRECTION OF THE COURT WITHOUT A JURY.

Seller's Initials _____        Buyer's Initials _SP_

15.9    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors and assigns.

15.10   The Members are signing this Agreement on behalf of a yet to be formed Limited Liability Company. The Members agree that upon the formation of the Buyer, the Members shall re-sign this agreement and each shall sign their respective Guaranty as attached hereto.

15.11   Notices.  All notices, requests, demands or other communications hereunder shall be in writing and shall be addressed to the Seller and Buyer, and their respective counsel at the following addresses, or as either Party from time to time may specify in writing to the other in accordance with this notice provision.

To the Seller:

David Seror, Trustee

22

BN 11974299v1

21650 Oxnard Street, Suite 500
Woodland Hills, California 91367

With a copy to:

Benjamin Seigel
Matthew Seror
Buchalter Nemer
1000 Wilshire Blvd., Suite 1500
Los Angeles, California 90017

To the Buyer:

LCV Properties, LLC
1875 Century Park East, Suite 700
Los Angeles, California 90067

15.11.1   All notices hereunder shall be effective (a) upon confirmation of telefacsimile transmission to the other Party, (b) upon delivery or attempted delivery after having been deposited in United States Mail, certified, postage prepaid, or sent by Federal Express or other reliable overnight courier service that provides written evidence of delivery, or (c) upon delivery, if delivered by personal service.

## ARTICLE 16
## LIQUIDATED DAMAGES

BUYER AND SELLER AGREE THAT IT WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO DETERMINE THE AMOUNT AND EXTENT OF DETRIMENT TO SELLER SHOULD BUYER FAIL OR REFUSE TO CONSUMMATE THE PURCHASE AND SALE TRANSACTION HEREIN PROVIDED FOR WITHIN THE TIME AND IN THE MANNER SET FORTH HEREIN OR DEFAULT IN THE PERFORMANCE OF ANY OF ITS OTHER OBLIGATIONS UNDER THIS AGREEMENT.  BUYER AND SELLER THEREFORE AGREE THAT IF BUYER FAILS TO COMPLETE THE PURCHASE AND SALE OF THE PROPERTY AS HEREIN PROVIDED BY REASON OF ANY DEFAULT ON BUYER'S PART, THEN SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF THE DEPOSIT WHICH IS A REASONABLE ESTIMATE OF SELLER'S DAMAGES AND NOT A PENALTY.  THE PAYMENT OF THE DEPOSIT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE SECTIONS 3275 OR 3369 AND OTHER SIMILAR TEXAS STATUTES, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE SECTIONS 1671, 1676 AND 1677 AND OTHER SIMILAR TEXAS STATUTES.  SELLER SHALL BE ENTITLED TO RETAIN SAID SUM AS LIQUIDATED DAMAGES. IN SUCH EVENT, THE ESCROW AGENT SHALL, UPON WRITTEN DEMAND BY SELLER, IMMEDIATELY DELIVER SUCH SUM TO SELLER BY WIRE TRANSFER OR CASHIER'S CHECK IN IMMEDIATELY AVAILABLE "SAME DAY" FUNDS. NOTWITHSTANDING THE FOREGOING, IF BUYER DEFAULTS WITH RESPECT TO

23

ANY OBLIGATION TO INDEMNIFY, DEFEND OR HOLD HARMLESS SELLER OR ANY
OTHER PERSON AS PROVIDED HEREIN, SELLER'S REMEDIES WITH RESPECT TO
SUCH A DEFAULT SHALL NOT BE LIMITED IN ANY MANNER, AND IN SUCH EVENT
SELLER SHALL BE ENTITLED TO PURSUE ANY AND ALL REMEDIES AVAILABLE
TO IT AT LAW OR IN EQUITY.

Seller's Initials _____        Buyer's Initials ___J. R.___

**SELLER:**

_____
David Seror
Chapter 7 Trustee in *In re: Double S
Development, LLP*, Case No. 09-bk-12032 MT


**BUYER:**

LCV Properties, LLC, a Texas Limited Liability
Company

By:_____
Name: Josh Rothstein
Title: Member


By:_____
Name: Ron Regwan
Title: Member


By:_____
Name: Stefan Pardoe
Title: Member


By:_____
Name: Pat Cain
Title: Member

24

EXHIBIT B PAGE 000064

IMMEDIATELY DELIVER SUCH SUM TO SELLER BY WIRE TRANSFER OR CASHIER'S CHECK IN IMMEDIATELY AVAILABLE "SAME DAY" FUNDS. NOTWITHSTANDING THE FOREGOING, IF BUYER DEFAULTS WITH RESPECT TO ANY OBLIGATION TO INDEMNIFY, DEFEND OR HOLD HARMLESS SELLER OR ANY OTHER PERSON AS PROVIDED HEREIN, SELLER'S REMEDIES WITH RESPECT TO SUCH A DEFAULT SHALL NOT BE LIMITED IN ANY MANNER, AND IN SUCH EVENT SELLER SHALL BE ENTITLED TO PURSUE ANY AND ALL REMEDIES AVAILABLE TO IT AT LAW OR IN EQUITY.

Seller's Initials _____        Buyer's Initials _____

**SELLER:**

_____
David Seror
Chapter 7 Trustee in *In re: Double S
Development, LLP*, Case No. 09-bk-12032 MT

**BUYER:**

LCV Properties, LLC, a Texas Limited Liability
Company

By:_____
___
    Name: Josh Rothstein
    Title: Member

By:_____
___
    Name: Ron Regwan
    Title: Member

By:_____
___
    Name: Stefan Pardoe
    Title: Member

24

BN 11974299v1

ANY OBLIGATION TO INDEMNIFY, DEFEND OR HOLD HARMLESS SELLER OR ANY OTHER PERSON AS PROVIDED HEREIN. SELLER'S REMEDIES WITH RESPECT TO SUCH A DEFAULT SHALL NOT BE LIMITED IN ANY MANNER, AND IN SUCH EVENT SELLER SHALL BE ENTITLED TO PURSUE ANY AND ALL REMEDIES AVAILABLE TO IT AT LAW OR IN EQUITY.

Seller's Initials _____        Buyer's Initials _SP_

**SELLER:**

_____
David Seror
Chapter 7 Trustee in *In re: Double S Development, LLP*, Case No. 09-bk-12032 MT

**BUYER:**

LCV Properties, LLC, a Texas Limited Liability Company

By:_____
    Name: Josh Rothstein
    Title: Member

By:_____
    Name: Ron Regwan
    Title: Member

By:_____
    Name: Stefan Pardoe
    Title: Member

By:_____
    Name: Pat Cain
    Title: Member

24

EXHIBIT B PAGE 000066

**SELLER:**

_____

David Seror
Chapter 7 Trustee in *In re: Double S
Development, LLP*, Case No. 09-bk-12032 MT


**BUYER:**

LCV Properties, LLC, a Texas Limited Liability
Company

By:_____
    Name: Josh Rothstein
    Title: Member


By:_____
    Name: Ron Regwan
    Title: Member


By:_____
    Name: Stefan Pardoe
    Title: Member

By:_____
    Name: Pat Cain
    Title: Member


24

BN 11974299v1